**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATALIE Y.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 24 C 0535** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, about three years ago in October of 2021. (Administrative Record (R.) 227-28). She claimed she had been disabled since April 25, 2010 (R. 227) – later amended to December 1, 2016 (R. 26) – as a result of "Left hip DJD and injury, Lumbar DJD and injury, adrenal insufficiency, thyroid, asthma, IBS, stomach issues, spinal nerve damage." (R. 247). Over the next two and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the most recent ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 18, 2024, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on May 17, 2024. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

decision.

## I.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: left hip degenerative joint disease; status post left foot metatarsal fracture; headaches; C5-C6 degenerative disc disease; C5 on C6 retrolisthesis with spinal stenosis; cervical radiculopathy; and adrenal insufficiency." (R. 26). The ALJ also found that although the plaintiff had a handful of other impairments – mild intermittent asthma, hypothyroidism, and gastrointestinal impairments – they were not severe. (R. 26). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (Lumbar spinal stenosis resulting in compromise of the cauda equina) 1.18 (Abnormality of a major joint(s) in any extremity), 9.00 (adrenal gland disorder), and 11.20 (dyscognitive seizures). (R. 27-30).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform light work "except the [plaintiff] could not have climbed ladders, ropes, or scaffolds and the claimant could not have had exposure to hazards such as unprotected heights or dangerous moving machinery." (R. 31). The ALJ then summarized the plaintiff's allegations, noting that she was involved in a motor vehicle accident in April of 2010 while on duty as a police officer, and that she suffered injuries to her hip and spine as a result. She had to undergo extensive treatment, including surgical intervention. In 2016, she noted that she was having trouble walking even 10 to

15 feet, was taking pain medication and was mainly bed-ridden. The plaintiff also said she had suffered from migraines relating back to the motor vehicle accident and also suffers from adrenal disorders. (R. 31).

The ALJ further noted that the plaintiff said her condition has worsened over the years. Her spine pain has gotten worse and her leg goes numb; her spinal pain progressed down her arms and hands and she cannot feel hot or hold. She could not rely on her right hand and while her left hand is better, she still has issues with it. She also said that she experienced waves of fatigue and trouble with tasks such as grocery shopping. Plaintiff also said that she had trouble lifting, standing, walking, sitting, reaching, and using her hands. She had issues with her memory, with completing tasks, and with concentration. She experienced fatigue, pain, and numbness in the limbs. The plaintiff conceded that she could go out alone and she could walk or drive a car, shop in stores, and shop by computer. She said she could pay bills, count change, handle a savings account, and use a checkbook. (R. 31). The ALJ then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 32).

The ALJ then went on to summarize the medical evidence. He noted that due to a 2010 motor vehicle accident, the plaintiff sustained a labral tear of the left hip as well as a full thickness chondral injury of the acetabulum. She had to undergo multiple surgical procedures, including a left hip arthroscopy, a labral repair and debridement, and an acetabular chondroplasty and microfracture surgery in June of 2010 and a revision surgery in February of 2011. Plaintiff also

underwent significant treatment for her musculoskeletal and neurological complaints, including medication management, multiple rounds of physical therapy, multiple types of injections (including nerve blocks and trigger point injections), lumbar plexus block, and radiofrequency ablation procedures of articular branches of the femoral and obturator nerves. Diagnostic testing also revealed mild multilevel degenerative changes in the cervical spine, with mild narrowing of the spinal canal at the C5-C6 level, C5 on C6 retrolisthesis with spinal stenosis, and cervical radiculopathy. (R. 32).

The ALJ continued, noting that there was no significant treatment for the plaintiff's overall condition in the medical record for the years 2015, 2016, or 2017. The ALJ noted that the plaintiff had moved to California from Chicago around the year 2015 and that it appeared there was some type of gap in treatment, which may have been due to her relocation. Plaintiff apparently relocated back to Illinois in the year 2016 or 2017. In November of 2015, during initial treatment with a new provider after relocating to California, plaintiff reported that she did previously have significant issues due to left hip pain, but that she was able to walk at that time after prolonged physical therapy, was functional, and was active on her medication regimen. She did experience occasional hot flashes and generalized fatigue due to her adrenal insufficiency. Through 2016, the plaintiff continued to report that she was functional and active. Physical examinations showed no costovertebral tenderness, and normal cranial nerves. Plaintiff indicated that she had no side effects from medication and was sleeping well. She did continue to complain of chronic hip pain, however, but her doctors said there was no obvious etiology for it. (R. 33).

The ALJ went on to explain that the plaintiff's main treatment in 2016 was with an endocrinology specialist for her issues relating to a diagnosis of adrenal insufficiency. The diagnosis

was adrenal insufficiency secondary to cortisone injections and steroid use in previous years. In 2015, the plaintiff's endocrinologist noted that her physical examinations were generally within normal limits, that she was well nourished, not in distress, had normal cranial nerves, there were no focal motor or sensory deficits, and she had normal gait, normal range of motion, and normal strength with some complaints of hip pain. In 2016, the plaintiff denied issues, such as thyroid enlargement, thyroid tenderness, shortness of breath, claudication, edema, tremor, decreased sensation, or paresthesia. Her extremities appeared normal, sensation was normal, and she had no lymphandenopathy in the neck. In 2017, exams showed no cyanosis, clubbing, or edema in the extremities and no symptoms of tremors, heart racing, palpitations, heat intolerance or cold intolerance, and no difficulty swallowing or breathing. (R. 33-34).

The ALJ then explained that he included some postural and environmental limitations in the plaintiff's residual functional capacity and limited the plaintiff to lifting no more than 20 pounds. But, he said additional restrictions did not appear necessary, as the plaintiff appeared to have improved, demonstrating a relatively stable symptomology, with no significant treatment and with her reporting that she was active and functional. Thus, the ALJ said, it was reasonable that, during the relevant period at issue, the plaintiff retained the ability to perform work within the parameters of the residual functional capacity he found. (R. 34).

The ALJ then went on to discuss the medical opinions in the record. He noted that there were several from before the plaintiff's alleged onset date. There were annual examinations and evaluations the plaintiff underwent relating to the continuation and/or termination of her pension and/or Workers' Compensation benefits through her previous employer, the South Elgin Police Department. In July of 2011, it was noted that she could perform work at a limited or light duty

capacity, but this should be a sedentary position.  Also in July of 2011, it was noted that it was unlikely that she could perform even in a sedentary position.  In June of 2013, it was noted that the plaintiff remained disabled from performing full unrestricted duties of a police officer and remained unlikely that she could perform even a sedentary position due to her pain with prolonged sitting and standing.  In September of 2014, it was noted that the plaintiff remained disabled from performing full unrestricted duties of a police officer and prolonged sedentary work also was likely to cause significant pain.  Finally, the ALJ noted that the record contained some temporary "return to work" status forms from the plaintiff's medical providers in the years 2010 and 2011, noting that the plaintiff could not return to work and then that she may return to work but light duty with desk work only.  (R. 35).

The ALJ said that these opinions were not persuasive as they were not supportable or consistent with the medical evidence of record relating to the plaintiff's date last insured.  He noted that the plaintiff's case had not been reopened.  The opinions referred to status prior to the earliest possible onset date available to the plaintiff, December 1, 2016.  The ALJ added that although the statements regarding the plaintiff's inability to perform her previous work as a police officer were consistent with the overall disposition of this case, the statements were on issues reserved to the Commissioner.  (R. 35).

The ALJ then turned to several medical opinions from the period subsequent to the plaintiff's date last insured, which again related to the annual examinations for the plaintiff's pension and/or Workers' Compensation benefits.  In January of 2018, it was noted that the plaintiff is permanently disabled from the accident in question and the provider did not think she will get back to her prior job.  In October of 2019, it was stated that the plaintiff was incapable of returning to her job as a

police officer and she is still disabled. In November of 2021, it was noted that the plaintiff is not able to return to her prior occupation; she is disabled and this is on a permanent level. Finally, in December 2022, it was stated that the plaintiff is unable to perform full and unrestricted police duty. But, similar to the other such opinions, the ALJ found these to be not persuasive as they were not supported or consistent with the medical evidence of record relating to the plaintiff's date last insured. He noted that they referred to functional limitations from years after the plaintiff's date last insured. And, the ALJ again noted that while the statements regarding the plaintiff's inability to perform her previous work as a police officer were consistent with his decision, those statements are on issues reserved to the Commissioner. (R. 36-37).

Relying on the vocational expert's testimony, the ALJ then found that while the plaintiff's residual functional capacity would not allow her to perform her past relevant work as a police officer, but, further relying on the vocational expert's testimony, the ALJ determined that there were other jobs that existed in significant number in the national economy that plaintiff could perform. Examples of those were: office helper (DOT No. 239.567-010/unskilled/light per the DOT/6,800 jobs in the national economy); mail clerk (DOT No. 209.687-026/unskilled/light per the DOT/11,300 jobs in the national economy); and a collator operator (DOT No. 208.685-010/unskilled/light per the DOT/33,000 jobs in the national economy). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 37)

**II.**

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case

differently in the first instance. See 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether "substantial evidence" exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the

path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build a "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). *See also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."). *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)(same).

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek that can be hopped across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on the panel felt

the ALJ had not adequately explained aspects of her reasoning, while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit again emphasized that all an ALJ really needs to do is "minimally articulate" his or her reasoning, *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016), and "that social-security adjudicators are subject to only the most minimal of articulation requirements," *Warnell v. O'Malley*, 97 F.4th 1050, 1053

(7th Cir. 2024), and that their obligation extends no further than grounding a decision in substantial evidence. *Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024). Thus, "[i]f a sketchy opinion assures [the reviewing court] that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). The question here is whether the ALJ did enough. We think he did not.

### III.

This happens to be one of those cases with a medical record that requires a bit more of a "logical bridge" than usual to get to the ALJ's conclusion that the plaintiff can perform nearly a full range of light work. Light work requires the ability to stand or walk about six hours a day. *Jarnutowski*, 48 F.4th at 774; *Stage v. Colvin*, 812 F.3d 1121, 1124 (7th Cir. 2016). The ALJ said he "included some postural and environmental limitations and has limited the claimant even further by noting that she would not be able to lift more than 20 pounds." (R. 34). The "postural limitations" required by the ALJ were that the plaintiff would not have to climb ladders, ropes, or scaffolds and would not have exposure to hazards such as unprotected heights or dangerous moving machinery. But, the real key is that the plaintiff would have to be on her feet, nearly all day every day, standing and walking. A hip injury that will seemingly require hip replacement surgery, along with some protruding discs in the lumbar and cervical spines – with understandably resulting pain – does not lead inexorably to such a result, so more of an explanation will be needed on remand. And a couple of other points discussed below will need a second look as well.

### A.

The plaintiff's health issues – and she has, and has had, several – began in April 2010 when

11

she was a police office in South Elgin, Illinois.  While she was responding to an emergency call, her vehicle was "t-boned" by a driver who ignored her emergency lights and sirens. As a consequence, she suffered injuries, most notably a labral tear to her left hip and femoral acetabular impingement. She underwent arthroscopic surgery in June 2010 to repair the tear, but had to undergo a second procedure several months later to repair a second tear and reshape the bone. She continued to suffer from recurrent femoral acetabular impingement and iliopsoas tendinitis.  She was granted a disability pension from the Police Board and will never be able return to her former work.  Not surprisingly, plaintiff suffers pain due to this injury and has sought relief through many means, including physical therapy, steroid injections, and nerve blocks.

That does not sound like someone who could have even performed light work – which, it bears repeating, requires about six hours of standing or walking everyday, *see Jarnutowski*, 48 F.4th] at 774 – on a regular basis back in 2011 and 2012.  But, for whatever reason, when plaintiff applied for disability benefits then, she was denied and she did not appeal.  She also applied more recently, in November 2016, with similar results.  As such, the determinations on those previous applications are *res judicata*.  *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998).  That's what led to the amended onset date of December 1, 2016, with this current application. A bit more on that later.

Plaintiff's issues became more complicated around 2014.  In addition to her hip pain, she sought treatment for lower back pain.  A May 2014 MRI showed a bulging disk contacting the descending nerve root and the left lateral recess at L4-5, some mild narrowing of the right neural foramen at L5-S1 secondary to a small protrusion, and ligamentum flavum and facet hypertrophy at the lower lumbar levels.  (R. 757-59). Oddly, the ALJ did not mention these lower back issues, either as a severe impairment or a non-severe impairment. (R. 26-27). While ALJs need not mention

12

every piece of evidence in their opinions, they cannot simply ignore evidence that is contrary to their conclusions. *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). Even if the protruding discs amounted to no more than a non-severe impairment – and the court is not saying they did – the ALJ had to consider them in combination with the plaintiff's hip and neck impairments. *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). Again, it is not self-evident that adding the back issues to the hip issue equals somehow equals standing and/or walking for six hours a day. And, the outcome is even less obvious when those are then combined with the trace disc bulges at three levels of the cervical spine and mild to moderate stenosis (R. 1455), which the ALJ *did* find was a "severe" impairment.

About the same time, plaintiff was also having problems with elevated glucose, hypertension, and decreased energy. It turned out she was experiencing adrenal insufficiency most likely secondary to all the steroid injections she had to control her pain. So that avenue of relief was cut off. And, so was the implantation of a spinal chord stimulator which was being considered at the time. (R. 645-56). She was left with repeated nerve blocks, ablations, and narcotics, through 2015. (R. 617, 621, 627, 629-30, 634, 640). Again, at least at that point, with the hip injury, the lower back issues, the neck impairment, the pain, and the steroid issue, it does not sound like someone who is going to be able to stand and walk for six hours a day, five days a week, fifty weeks a year.

## B.

It was about that time that plaintiff moved to California – at one point, she had noticed that a trip to that drier climate had helped with her pain somewhat. (R. 617-18). And, it was about this point in the record that the ALJ found that the plaintiff had a gap in treatment and focused on that

13

in support of his idea that her condition had improved and stabilized. (R. 33). But review of the record suggests otherwise. After relocating, plaintiff, of course, had to find new doctors and navigate health insurance. She began by simply trying to secure her prescription for Tramadol to curb her pain. (R. 408-10). Once settled, she continued physical therapy (R. 425) and continued to suffer hip, back, and leg pain. (R. 474, 2112, 2125).

But she also had to address her adrenal insufficiency, which was causing generalized fatigue and weakness though 2015 and into 2016. (R. 1069, 1072, 1076, 2100). In May 2016, she was suffering severe abdominal pain and an ultrasound revealed an ovarian cyst. She had to undergo drainage of the cyst, and a hysteroscopy with dilation and curettage and distention cystoscopy. (R. 434-44). And she was "hit" with even more medical problems when she sought treatment for more abdominal pain in the Fall of 2016. It was discovered that she was pregnant and had a subchorionic hemorrhage. (R. 411-12). She suffered constant pelvic discomfort and bloating and had a miscarriage. (R. 414-16). She had to undergo a dilation and curretage on October 13, 2016. (R. 417-18).

All in all, for her various medical setbacks, the plaintiff appears to have sought treatment multiple times in September and October of 2015 (R. 476-77), on November 16 and 17, 2015 (R. 408, 1069), February 2, 2016 (R. 2100, 2145), February 25, 2016 (R. 430, 457), April 28, 2016 (R. 456), May 3, 2016 (R. 432), May 11, 2016 (R. 2122, 2142), May 26, 2016 (R. 2021), September 18, 2016 (R. 411), October 11, 2016 (R. 455), October 13, 2016 (R. 414), October 19, 2016 (R. 2116, 2128). During that time, she was seeing a specialist in Mount Shasta, California, and Medford, Oregon, which are 90 miles apart. (R. 62). That certainly does not sound like a gap in treatment – quite the contrary. And, more importantly, it does not sound like something that someone whose

14

medical problems were "under control" would go through.

So, the ALJ's "gap in treatment" theory (R. 33) is belied by the record. In addition, the plaintiff had numerous other medical problems going on, and it makes sense that she was addressing those and simply treading water, as it were, with her numerous pain issues. That pain had not gone away, as the ALJ seems to have thought. Indeed, as of mid-2016, plaintiff was taking three Tramadol, six Tylenol, and six Ibuprofen daily to deal with her ongoing pain. (R. 1083). I cannot see what the ALJ was getting at with his analysis of this time period. He needed to look into what he thought was a gap in treatment a bit more deeply, *see, e.g., Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013), because the evidence fails to support his somewhat superficial take on what was going on with the plaintiff at the time. It is a problem that has to be addressed on remand.

## C.

Then there are the assessments from the doctors who regularly examined the plaintiff for the purposes of her police disability pension. The ALJ dismissed these, essentially on the basis of *res judicata*, although that's not entirely clear from the ALJ's explanation. First, as to opinions from before the plaintiff's amended alleged onset date:

> [As] the [plaintiff's] prior application is not being reopened[,]... opinions from the period relevant to those applications are not supportable, consistent with the medical evidence of record from the year 2016, or persuasive, as they refer to functional limitations from prior to the earliest possible onset date available to the claimant, which is her amended alleged onset date of December 1, 2016, and do not consider any evidence from the relevant period since the denial of her previous application.

(R. 34). But, with progressive diseases like the plaintiff suffers from – degenerative joint disease or degenerative disc disease for example – evidence from the prior application is not barred from

15

consideration. *Groves*, 148 F.3d at 810-11. The question should have been whether the opinions were consistent with the record at the time they were issued and with the examining doctor's findings. The ALJ took a similar tack with opinions from after the pertinent period:

> similar to the above analysis, these opinions are not inherently valuable not persuasive in this decision as they are not supported or consistent with the medical evidence of record relating to the claimant's date last insured. In this regard, the undersigned notes that these opinions refer to functional limitations from years after the [plaintiff's] date last insured.

(R. 35). But, when one thinks about the opinion from before the pertinent period and the opinion from right after the pertinent period, it is clear that the ALJ was too dismissive of this medical evidence.

In September 2014, Dr. Jacker noted that the plaintiff walked with a left-sided limp, Trendelenberg sign was positive for weak left hip abductor muscles, and that left hip flexion was 110° with pain and "a grinding crepitation." He said that crepitation was most notable as plaintiff bears weight when there is also an audible crepitus. (R. 400). A limp, weakness, pain and *grinding* crepitation does not support a conclusion that plaintiff could walk or stand for six hours a day, five days a week. Not surprisingly, Dr. Jacker concluded that the plaintiff was "disabled from performing full unrestricted duties as a police officer. Prolonged sedentary work also is likely to cause her significant pain at this time." (R. 400). In January 2018, Dr. Freedburg noted tenderness at L5, mild tenderness over the paraspinal muscles, limited range of motion in the lower back, 10% loss of range of motion in the left hip with severe pain, breakthrough weakness of hip muscles, positive straight leg raising with severe pain and weakness. (R. 533). Again, severe pain and breakthrough weakness do not readily support a light work RFC with all the standing and walking required. Dr. Freedburg said the plaintiff was permanently disabled, a likely candidate for total hip arthroplasty, and could

never return to her previous occupation. (R. 534). The two opinions are rather consistent with one another. Unless the plaintiff's progressive and severe degenerative hip and disc diseases went away for a month or two after September 2014 and then came storming back as bad as ever in January 2018, the ALJ's analysis does not make much sense. Remand is required.

## CONCLUSION

For the foregoing reasons, the plaintiff's request for a remand [Dkt. #18] is granted, the defendant's motion for summary judgment [Dkt. #19] is denied, and this case is remanded to the Commissioner.

## POST SCRIPT

While it is not a point that needs to be belabored, and perhaps would not warrant a remand on its own, there is continuing dissatisfaction with the job numbers the vocational experts all too often trot out in their testimony. Here, the vocational expert said there were 6,800 office helper jobs in the national economy. Yet the vocational expert in *Terrence H. v. Martin J. O'Malley*, No. 23 C 17091, 2024 WL 3833967, at *4 (N.D. Ill. Aug. 15, 2024) said there were 93,000 such jobs. The figures offered were 55,000 in *Daniel V. v. O'Malley*, No. 20-CV-50435, 2024 WL 2274327, at *5 (N.D. Ill. May 20, 2024), and 58,000 in *Alethea T. A. v. Kijakazi*, No. 21 C 2167, 2023 WL 8091645, at *2 (N.D. Ill. Nov. 21, 2023). The vocational expert in this case said there were 11,300 mail clerk jobs in the national economy. The expert in *Emma U. v. Martin J. O'Malley*, No. 21 CV 778, 2024 WL 3860015, at *1 (N.D. Ill. Aug. 19, 2024) said there were three times as many, while the expert in *Michael G. v. O'Malley*, No. 21 CV 580, 2024 WL 3791626, at *2 (N.D. Ill. Aug. 12, 2024) said there were *ten times* as many.

There were 33,000 collator operator positions cited here; the offerings in other cases have

ranged from; 13,000 jobs, *Lucas v. Kijakazi*, No. 20-C-799, 2021 WL 4476537, at *9 (E.D. Wis. Sept. 30, 2021), to 16,000, *Wildenberg v. Kijakazi*, No. 20-CV-297-BBC, 2021 WL 4077498, at *6 (W.D. Wis. Sept. 8, 2021), to 42,737. *Javier G. v. Kijakazi*, No. 22 C 3086, 2023 WL 2587812, at *2 (N.D. Ill. Mar. 21, 2023). As already stated, the numbers in this case might not be a basis for a remand, *see, e.g., Daniel L. v. Kijakazi*, 2023 WL 5830807, at *11 (N.D. Ill. Sept. 8, 2023), but the disconcerting fact remains that the outcome of certain cases are dependent on wildly inconsistent job figures offered by the government seemingly without concern for consistency or accuracy. It makes one wonder how accurate these estimates are, and which ones are right and which ones are very wrong. This sort of uncertainty is intolerable in a process that can play so pivotal a role in a person's destiny. While "[c]ertainty [may be] an illusion and repose... not the destiny of man," Holmes, *The Path of the Law*, 10 Harv.L.Rev. 457, 465 (1897),[2] the kind of inconsistency and variance in job number figures routinely and unthinkingly relied on by ALJs is deeply disturbing. Decisions on which so much is riding ought not be based on such uncertainty.

ENTERED: _____

**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 10/15/24

---

[2] *See also United States v. Chaidez*, 919 F.2d 1193, 1200 (7th Cir. 1990).